EXHIBIT 3

RECEIVED

JUN 3 0 2021

CIRCUIT COURT
FOR BALTIMORE CITY

## IN THE CIRCUIT COURT FOR BALTIMORE CITY

D.A., et al.,

      Plaintiff,

      v.

**LARRY HOGAN, in his official capacity as GOVERNOR of the State of Maryland, et al.,**

      Defendants.

Case No. _____

---

## MOTION FOR TEMPORARY RESTRAINING ORDER <u>AND PRELIMINARY INJUNCTION</u>

Plaintiffs D.A., D.M., Jennifer Graham, A.M., Kevin Baxter, and Shad Baban ("Plaintiffs"), pursuant to Maryland Rules 15-504 and 15-505, hereby file this Motion for Temporary Restraining Order and Preliminary Injunction ("Motion"). This action arises out of the State of Maryland's refusal to ensure continued access to federal unemployment benefits offered through the Coronavirus Aid, Relief, and Economic Security ("CARES") Act to over 300,000 Maryland workers, including Plaintiffs. These benefits have served as a vital lifeline for hundreds of thousands of Marylanders during a time of unprecedented economic hardship caused by the COVID-19 pandemic. By terminating the State's administration of these benefits prematurely, the State has violated the General Assembly's clear directive to maximize unemployment benefits available to eligible Maryland residents. With its unlawful action, the State is unnecessarily and prematurely cutting a lifeline for struggling Marylanders and risks plunging tens of thousands of Maryland citizens into housing instability and economic crisis. If the Court does not enjoin the State's withdrawal from unemployment benefits offered through the CARES Act, Plaintiffs will suffer immediate, substantial, and irreparable injury.

#747331

Accordingly, for the reasons more fully explained in the Memorandum in Support of the Motion, Plaintiffs request a Temporary Restraining Order and Preliminary Injunction seeking to (1) require Governor Hogan to rescind his letter of June 1, 2021, providing notice of the State's termination of its participation in certain CARES Act unemployment benefits as further described in the Memorandum filed in support of this Motion; (2) enjoin Governor Hogan and Secretary Robinson, their officers, employees, and agents, all persons acting in concert or participation with any Defendant, or under any Defendant's supervision, direction, or control, from withdrawing the State of Maryland from unemployment benefits offered through the CARES Act; and (3) order Governor Hogan and Secretary Robinson, on behalf of the State of Maryland, to immediately notify the U.S. Department of Labor of the State's continued participation in the CARES Act programs for the duration of those programs.

Respectfully submitted,

**GALLAGHER EVELIUS & JONES LLP**

/s/ Paul S. Caiola
Paul S. Caiola, CPF # 9512120109
Meghan K. Casey CPF # 1506090003
Hannah Logue Perng CPF # 1412170166
218 North Charles Street, Suite 400
Baltimore, Maryland  21201
Telephone: (410) 727-7702
Facsimile: (410) 468-2786
pcaiola@gejlaw.com
mcasey@gejlaw.com
hperng@gejlaw.com

**PUBLIC JUSTICE CENTER**

/s/ Sally Dworak-Fisher
Sally Dworak-Fisher, CPF # 0312220001
Debra L. Gardner, CPF # 8509010013
Monisha Cherayil, CPF # 0909020002
Tyra M. Robinson, CPF # 1912180113

201 North Charles Street, Suite 1200
Baltimore, Maryland  21201
Telephone: (410) 625-9409
Facsimile: (410) 625-9423
dworak-fishers@publicjustice.org
gardnerd@publicjustice.org
cherayilm@publicjustice.org
robinsont@publicjustice.org.

*Attorneys for Plaintiffs*

Dated: June 30, 2021

**IN THE CIRCUIT COURT FOR BALTIMORE CITY**

| | |
|---|---|
| **D.A., et al.,** | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | *   **Case No. _____** |
| | * |
| **LARRY HOGAN, in his official capacity as** | * |
| **GOVERNOR of the State of Maryland, et al.,** | * |
| | * |
| Defendants. | * |
| | * |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on June 30, 2021, a copy of the foregoing Motion for

Temporary Restraining Order and Preliminary Injunction, Memorandum of Law in Support of

Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, along with a

Proposed Order and this Certificate of Service, were served by email and first-class mail, postage

prepaid, on:

Brian Frosh
Attorney General of Maryland
200 St. Paul Place, 20th Floor
Baltimore, MD 21202

/s/ Paul S. Caiola
_____
Paul S. Caiola, CPF # 9512120109
Gallagher Evelius & Jones LLP
218 North Charles Street, Suite 400
Baltimore, Maryland  21201
Telephone: (410) 727-7702
Facsimile: (410) 468-2786
pcaiola@gejlaw.com

#747331

**IN THE CIRCUIT COURT FOR BALTIMORE CITY**

| | |
|---|---|
| **D.A., et al.,** | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | *   **Case No. _____** |
| | * |
| **LARRY HOGAN, in his official capacity as** | * |
| **GOVERNOR of the State of Maryland, et al.,** | * |
| | * |
| Defendants. | * |
| | * |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

Plaintiffs D.A., D.M., Jennifer Graham, A.M., Kevin Baxter, and Shad Baban ("Plaintiffs"), pursuant to Maryland Rules 15-504 and 15-505, respectfully submit this Memorandum of Law in Support of their Motion for Temporary Restraining Order and Preliminary Injunction.

This action arises out of the State of Maryland's refusal to ensure continued access to federal unemployment benefits offered through the Coronavirus Aid, Relief, and Economic Security ("CARES") Act to over 300,000 Maryland workers, including Plaintiffs. These benefits have served as a vital lifeline for hundreds of thousands of Marylanders during a time of unprecedented economic hardship caused by the COVID-19 pandemic. By terminating the State's administration of these benefits prematurely, the State has violated the General Assembly's clear directive to maximize unemployment benefits available to eligible Maryland residents (*e.g.*, to "cooperate with the United States Secretary of Labor *to the fullest extent that [the law] allows*") and violated the Maryland Constitution. With its unlawful action, the State is unnecessarily and prematurely cutting a lifeline for struggling Marylanders and risks plunging

#747272

tens of thousands of Maryland citizens into housing instability as well as severe emotional and economic crisis.  If the Court does not enjoin the State's withdrawal from unemployment benefits offered through the CARES Act, Plaintiffs will suffer immediate, substantial, and irreparable injury.

## STATEMENT OF FACTS

**I.      Congress Expanded Eligibility for Unemployment Benefits in Response to the Unprecedented COVID-19 Crisis.**

Since March of 2020, the United States has experienced an unprecedented public health crisis due to the COVID-19 pandemic.  The pandemic resulted in mass layoffs and business closures across the United States and the State of Maryland, leading to levels of unemployment not seen in the United States since the Great Depression.  Compl. ¶¶ 47-48.  As a response to the economic dislocation caused by the pandemic, Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, codified as 15 U.S.C. § 9001 *et seq.*  The CARES Act was signed into law on March 27, 2020.  Compl. ¶ 49.

The CARES Act enhances unemployment insurance ("UI") benefits for workers who would not otherwise be eligible for relief.  In relevant part, the CARES Act creates three types of benefits (collectively, "CARES Act Benefits").  First, Pandemic Unemployment Assistance ("PUA") provides unemployment insurance coverage to those who would not have otherwise been eligible for regular UI benefits and whose unemployment, partial unemployment, unavailability, or inability to work was caused by COVID-19.  15 U.S.C. § 9021.  These include the self-employed and workers without childcare assistance.  A second category of benefits, Pandemic Emergency Unemployment Compensation ("PEUC"), extends UI benefits for workers who have exhausted the number of weeks they could draw UI payments but who are experiencing extended unemployment.  15 U.S.C. § 9025.  And third, Federal Pandemic

Unemployment Compensation ("FPUC") increased the amount of UI payments a worker could receive by $600 per week from March 27, 2020 to July 31, 2020, and $300 per week from December 27, 2020 to September 6, 2021.  15 U.S.C. § 9023, further amended by the American Rescue Plan Act of 2021 ("ARPA"), Pub. L. No. 117-2, §§ 9011, 9013, 9016 (March 11, 2021).

The CARES Act requires the U.S. Secretary of Labor to provide CARES Act Benefits through agreements with the States.  The CARES Act provides that agreements regarding the receipt of PEUC and FPUC benefits may be terminated by a state upon 30 days' written notice, 15 U.S.C. §§ 9023(a), 9025(a); no such termination provision exists for PUA benefits.  *See* 15 U.S.C. § 9021(b).

CARES Act Benefits are authorized through September 6, 2021.  ARPA §§ 9011, 9013, 9016.  Funds have been appropriated by Congress and are available in the Unemployment Trust Fund to be received by eligible Marylanders.  Compl. ¶ 54.

## II.      Hundreds of Thousands of Marylanders Have Been Receiving CARES Act Benefits Since March 2020.

On March 28, 2020, one day after the CARES Act became law, the Maryland Department of Labor, on behalf of the State of Maryland, entered into an agreement with the U.S. Department of Labor, accepting PUA, PEUC, and FPUC benefits for all eligible Maryland claimants.  Compl. ¶ 56.  The Unemployment Insurance Division of the Maryland Department of Labor (the "Division"), which processes claims for UI benefits and distributes payments to eligible individuals, encouraged new claimants to enroll for federal CARES Act Benefits. Compl. ¶¶ 57-58.  Hundreds of thousands of Maryland residents have been entitled to receive and have been receiving CARES Act Benefits since March 2020.  Compl. ¶ 59.

Plaintiffs are among Maryland's aid recipients.  Plaintiff D.A. currently receives PEUC and FPUC benefits.  Exhibit A, Affidavit of D.A. at ¶¶ 4-5.  Plaintiff D.M. currently receives

PUA and FPUC benefits.  Exhibit B, Affidavit of D.M. at ¶¶ 6-7.  Plaintiff Jennifer Graham

currently receives PUA and FPUC benefits.  Exhibit C, Affidavit of Jennifer Graham at ¶¶ 5, 7.

Plaintiff A.M. currently receives regular UI and FPUC benefits.  Exhibit D, Affidavit of A.M. at

¶¶ 4, 6.  Plaintiff Kevin Baxter currently receives PEUC and FPUC benefits.  Exhibit E,

Affidavit of Kevin Baxter at ¶¶ 4, 6.  Plaintiff Shad Baban currently receives PEUC and FPUC

benefits.  Exhibit F, Affidavit of Shad Baban at ¶¶ 2, 3.

### III.     Maryland Law Requires the Secretary of Labor to Secure Unemployment Benefits for Eligible Marylanders to the "Fullest Extent" Possible.

On June 1, 2021, Governor Hogan notified the U.S. Secretary of Labor that Maryland

would be ending its participation in PUA, PEUC, and FPUC benefits on July 3, 2021, more than

two months prior to the federal expiration of these benefits.[1]  See Exhibit G, Letter from

Governor Larry Hogan to The Honorable Martin J. Walsh.  Governor Hogan also announced his

decision publicly on June 1, 2021.  In the Governor's public statement, he insisted without

evidence that "jobs are now in good supply," and "we have a critical problem where businesses

across our state are trying to hire more people, but many are facing severe worker shortages."[2]

As discussed in Part IV.B below, data shows that the early termination of CARES Act Benefits

has not eased labor shortages in other states.  Moreover, by stripping Marylanders of federally-

funded benefits over two months before those benefits expire, Defendants have directly

contravened Maryland law.

---

[1] The letter also provided notice that Maryland would be ending the State's participation in the Mixed Earners Unemployment Compensation ("MEUC") benefits program.

[2] As Economic Recovery Continues, Maryland to Discontinue Enhanced Pandemic Unemployment Benefits (June 1, 2021), https://governor.maryland.gov/2021/06/01/as-economic-recovery-continues-maryland-to-discontinue-enhanced-pandemic-unemployment-benefits/.

In Title 8 of the Labor and Employment Article, which governs Maryland's unemployment insurance program, the General Assembly made legislative findings about the grave dangers posed by unemployment.  The General Assembly found that "economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of [Maryland]."  Md. Code. Ann., Lab. & Empl. § 8-102(b)(1).  The General Assembly described involuntary unemployment as "the greatest hazard of our economic lives," which "often falls with crushing force on the unemployed worker and [his or her] family."  Lab. & Empl. § 8-102(b)(2)-(3).  And it found involuntary unemployment to be "a subject of general interest and concern," requiring "appropriate action by the General Assembly to prevent [its] spread ... and to lighten its burden."  Lab. & Empl. § 8-102(b)(2).  The General Assembly further declared its clear policy conclusion that:

> [T]he public good and general welfare of the citizens of the State require the enactment of [Title 8], under the police powers of the State, for the compulsory setting aside of unemployment reserves to be used for the benefit of individuals unemployed through no fault of their own.

Lab. & Empl. § 8-102(c).  These factual findings and policy statements by the General Assembly "guide … the interpretation and application of" Title 8.  Lab. & Empl. § 8-102(a).

During the 2021 Legislative Session, the General Assembly reaffirmed its intention to maximize the availability of unemployment benefits for Maryland recipients.  Through emergency legislation enacted on April 9, 2021, the General Assembly required the Maryland Department of Labor, on or before June 1, 2021, to "identify all changes in federal regulations and guidance *that would expand access to unemployment benefits* or reduce bureaucratic hurdles to prompt approval of unemployment benefits."  2021 Md. Laws Ch. 49, Section 3(a) (emphasis added).  The legislation further requires the Department of Labor, on or before July 1, 2021, to

"revise State unemployment insurance rules and practices to encompass any changes in federal regulations and guidance."  2021 Md. Laws Ch. 49, Section 3(b).

The General Assembly has assigned to the Maryland Secretary of Labor the duty to administer the State's Unemployment Insurance Fund, from which unemployment benefits are paid to eligible Marylanders.  Lab. & Empl. § 8-402.  In administering the State's unemployment insurance program, Secretary Tiffany Robinson is required to coordinate with federal agencies to further the public policy articulated by the General Assembly in Title 8.  The Secretary must "cooperate with the United States Secretary of Labor *to the fullest extent that [Title 8] allows*."  Lab. & Empl. § 8-310(a)(1) (emphasis added).

The Secretary's cooperation requires accepting federal UI funds.  In enumerating the sources of funding for the State's Unemployment Insurance Fund, Title 8 directs that the Fund "shall consist of: ... (6) money received from the Federal Unemployment Account in the Unemployment Trust Fund in accordance with Title XII of the Social Security Act; (7) money credited to the State Unemployment Trust Fund Account under § 903 of the Social Security Act; and (8) money received for the Fund from any other source."  Lab. & Empl. § 8-403(a).  The "Unemployment Trust Fund" referenced in § 8-403(a) is governed by 42 U.S.C. § 1104, which funds PUA and PEUC benefits.  This section also cross references 42 U.S.C. § 1105, which is the source of FPUC funding.[3]  Title 8 thus makes clear that Secretary Robinson has a statutorily-

---

[3] The CARES Act Benefits are funded by federal unemployment programs established under 42 U.S.C. §§ 1101(a), 1104(a), and 1105(a).   Specifically, PUA benefits, including FPUC and administration costs, are funded by 42 U.S.C. §§ 1104(a) and 1105(a).  *See* 15 U.S.C. § 9021(g).  PEUC benefits, including FPUC, are funded by 42 U.S.C. §§ 1104(a) and 1105(a), while PEUC administration costs are funded by 42 U.S.C. § 1101(a).  *See* 15 U.S.C. § 9025(d).

imposed duty to accept federal funds into the Maryland Unemployment Insurance Fund, including CARES Act funds.

Governor Hogan, for his part, has a duty under the Maryland Constitution to "take care that the Laws are faithfully executed." Md. Const. art. II, § 9. This constitutional provision ensures that the Governor of Maryland cannot contravene the statutory duties imposed upon his appointees or other elected officials.

By terminating Maryland's participation in CARES Act Benefits, Defendants are violating their statutory and constitutional duties to secure such benefits for hundreds of thousands of eligible Marylanders, including Plaintiffs.

## IV. The Defendants' Unlawful Early Termination Decision Will Have a Devastating Impact on Maryland Recipients of UI Benefits, Including Plaintiffs.

### A. Terminating federally-funded benefits for eligible Marylanders will risk plunging Maryland residents, including Plaintiffs, into housing instability and poverty and will be detrimental to their emotional and physical health.

As of May 29, 2021, over 300,000 Marylanders were receiving some form of unemployment benefits. Compl. ¶ 80.[4] If the State's early termination of CARES Act Benefits is allowed to take effect, 84.7% of those Marylanders will be left with no unemployment assistance at all. Compl. ¶ 81. Though other states have announced that they, too, intend to terminate CARES Act Benefits for their residents, no other state in the country has as high a percentage of residents who will be completely cut off from unemployment benefits with the termination of CARES Act funding.

---

[4] See also National Employment Law Project, 4.7 Million Workers Face Premature Cutoff of Pandemic Unemployment Programs (June 23, 2021), https://www.nelp.org/publication/4-7-million-workers-face-premature-cutoff-of-pandemic-unemployment-programs/, with report data available at https://s27147.pcdn.co/wp-content/uploads/6-22-21-CC-CutoffStatesData-withBIPOC.pdf (reflecting data for week ending May 29, 2021).



Credit: National Employment Law Project, "4.7 Million Workers Face Premature Cutoff of Pandemic Unemployment Programs." https://www.nelp.org/publication/4-7-million-workers-face-premature-cutoff-of-pandemic-unemployment-programs/

In addition, 46,522 Maryland recipients of regular unemployment benefits will have their weekly benefits cut by $300 per week if the State's termination of the FPUC supplement takes effect. Compl. ¶ 81.

Defendants' termination of CARES Act Benefits will have a particularly devastating effect on Plaintiffs. Plaintiff D.A. faces losing her residence with her wife and stepdaughter, in addition to family food insecurity. Exhibit A, Affidavit of D.A. at ¶ 11. Plaintiff D.M. may lose his residence at the sober living house where he is recovering from addiction, putting him at serious risk of relapse. Exhibit B, Affidavit of D.M. at ¶¶ 11, 12. Ms. Graham faces losing her residence and the permanent loss of the business she built over more than a decade, as well increased effects of her complex post-traumatic stress disorder and clinical depression. Exhibit C, Affidavit of Jennifer Graham at ¶¶ 3, 10, 11, 13 14. Plaintiff A.M. faces losing the home he has lived in for twenty years with his wife and may not be able to afford his medical

prescriptions for arthritis, diabetes, and high blood pressure.  Exhibit D, Affidavit of A.M. at ¶¶ 9, 11.  Mr. Baxter could lose his cell phone and transportation money and is suffering from increased effects of his feelings of depression and anxiety.  Exhibit E, Affidavit of Kevin Baxter at ¶¶ 10, 11.  Plaintiff Baban faces losing his car and his home, and is at risk of being without any safe and stable housing for himself, his wife, and his nine-month old daughter, and is suffering loss of appetite and insomnia requiring medical treatment.  Exhibit F, Affidavit of Shad Baban at ¶ 10.  Most Plaintiffs anticipate securing employment in the fall of 2021 and intended to rely on CARES Act Benefits only to tide them through the summer months as the economy continues to re-emerge from the pandemic.  See Exhibit B, Affidavit of D.M.; Exhibit C, Affidavit of Jennifer Graham; Exhibit D, Affidavit of A.M.; Exhibit F, Affidavit of Shan Baban.  The severe harms that Plaintiffs confront are thus a direct result of the *early* termination of benefits and would be avoided altogether if benefits continued until the federal termination date of September 6.

      **B.**    **Studies show that the expansion of unemployment benefits during the COVID-19 pandemic has had little to no effect on filling jobs.**

Contrary to Governor Hogan's stated rationale for terminating CARES Act Benefits early, studies have found no evidence that the expansion of unemployment benefits has depressed job growth or slowed rehiring over the past year.  To offer a few examples:

- A study published by the Tobin Center for Economic Policy at Yale University[5] found "no evidence that more generous benefits disincentivized work either at the onset of the expansion [of benefits] or as firms looked to return to business over time."  Instead, the study found that workers who received higher amounts of unemployment insurance returned to their previous jobs at similar rates as others.

---

[5] Dana Scott and Joseph Altonji et al, Employment Effects of Unemployment Insurance Generosity During the Pandemic, Tobin Center for Economic Policy, Yale University (July 14, 2020), https://tobin.yale.edu/sites/default/files/files/C-19%20Articles/CARES-UI_identification_vF(1).pdf.

- The National Bureau of Economic Research conducted a study[6] which found "no evidence that high UI replacement rates drove job losses or slowed rehiring." To the contrary, the study found that "states with more generous unemployment insurance benefits had milder [economic] declines and faster recoveries."

- An economist at the University of Amherst studied Census Pulse Survey data from tens of thousands of households and found no evidence to support a claim that increased unemployment benefits provided by FPUC have held back the recovery of the labor market.[7]

Most recently, a May 2021 study published by the Economic Policy Institute found little evidence that expanded unemployment benefits were a primary impingement on the labor supply. Josh Bivens & Heidi Shierholz, Restaurant labor shortages show little sign of going economywide: Policymakers must not rein in stimulus or unemployment benefits, Economic Policy Institute (May 11, 2021), https://www.epi.org/blog/restaurant-labor-shortages-show-little-sign-of-going-economywide-policymakers-must-not-rein-in-stimulus-or-unemployment-benefits/. The study's authors noted that low-wage sectors, where one might expect to see more shortages in favor of unemployment benefits, actually saw "the fastest job growth in April by a substantial margin." Id. The study further observed that "evidence strongly suggests" that continued caregiving responsibilities impinge on the labor supply of women, constituting "the primary labor supply bottleneck." Id. The study concluded, "Cutting back on pandemic UI provisions will not increase the labor supply of those who cannot work because of COVID-related caregiving responsibilities." Id.

---

[6] Alexander W. Bartnik et al, Measuring the Labor Market at the Onset of the COVID-19 Crisis, National Bureau of Economic Research (July 2020), https://www.nber.org/system/files/working_papers/w27613/w27613.pdf.

[7] Arindrajit Dube, The Impact of the Federal Pandemic Unemployment Compensation on Employment: Evidence from the Household Pulse Survey, University of Massachusetts Amherst (July 31, 2020), http://reparti.free.fr/dube720.pdf.

Relatedly, there is evidence to suggest that prematurely terminating CARES Act Benefits will not make any dent in any labor shortage in the State.  In Missouri, where the state cut off federal unemployment benefits on June 12, 2021, workforce development officials have seen "virtually no uptick in applicants" in the past few weeks.  Patricia Cohen, *Where Jobless Benefits Were Cut, Jobs Are Still Hard to Find*, N.Y. Times (June 27, 2021), https://www.nytimes.com/2021/06/27/business/economy/jobs-workers-unemployment-benefits.html.  Nationally, the online job site Indeed has found that in states that have abandoned federal unemployment benefits, clicks on job postings were below the national average.  Id.

## LEGAL STANDARD FOR INJUNCTIVE RELIEF

An injunction is a form of equitable relief "framed according to the circumstances of the case commanding an act which the court regards as essential to justice, or restraining an act which it esteems contrary to equity and good conscience." 100 Harborview Drive Condo. Council of Unit Owners v. Clark, 224 Md. App. 13, 64 (2015) (citing El Bey v. Moorish Sci. Temple of Am., Inc., 362 Md. 339, 353-54 (2001)).  The Court may grant an injunction "upon the terms and conditions justice may require."  Md. Rule 15-502(b).

Preliminary injunctive relief is designed to "preserve the court's ability to render a meaningful decision on the merits by sustaining the status quo."  Ehrlich v. Perez, 394 Md. 691, 734 (2006) (internal quotation marks and citation omitted).  In determining whether to grant preliminary injunctive relief, Maryland courts consider four factors: "(1) the likelihood that the plaintiff will succeed on the merits; (2) the 'balance of convenience' determined by whether greater injury would be done to the defendant by granting the injunction than would result from its refusal; (3) whether the plaintiff will suffer irreparable injury unless the injunction is granted; and (4) the public interest."  Fogle v. H & G Restaurant, Inc., 337 Md. 441, 455-56 (1995)

(citation omitted); <u>Schisler v. State</u>, 394 Md. 519, 534 (2006) (applying four-factor test to review

of temporary restraining order).  Further, the Court may grant a temporary restraining order if it

clearly appears that the moving party will suffer "immediate, substantial, and irreparable harm."

Md. Rule 15-504(a).[8]

**<u>ARGUMENT</u>**

**I.      Plaintiffs Are Entitled to a Temporary Restraining Order and Preliminary
          Injunction.**

      Plaintiffs satisfy all four factors of the injunction test, and they will suffer immediate,

substantial, and irreparable harm if the Court does not enjoin the State from prematurely cutting

off Plaintiffs' CARES Act Benefits.  Indeed, this case is factually and legally similar to <u>Ehrlich</u>

<u>v. Perez</u>, 394 Md. 691 (2006), in which the Maryland Court of Appeals affirmed the trial court's

decision to enjoin the Maryland Governor, Maryland Secretary of Health, and Maryland State

Treasurer from cutting off medical assistance benefits to resident alien children and pregnant

women, in contravention of Article 24 of the Maryland Declaration of Rights.  <u>Id.</u> at 735.  The

trial court in that case had concluded that the plaintiffs satisfied the four requirements for a

preliminary injunction:  the plaintiffs were irreparably injured because they could not afford

health care without State-funded assistance; the public interest was "best served if the State is

required to provide benefits [to plaintiffs] for which they [were] currently entitled"; and the

---

[8] Md. Rule 15-504, which governs temporary restraining orders, recently was amended to
require that the court "examines and makes appropriate findings regarding:

    (A)        the likelihood that the moving party will succeed on the merits;
    (B)        the balance of harm to each party if relief is or is not granted;
    (C)        whether the moving party will suffer irreparable injury unless the order is granted;
        and
    (D)        a determination that granting the order is not contrary to the public interest."

This amendment will be effective July 1, 2021.

plaintiffs were likely to prevail on their claim that the State's budgetary decision to cut off benefits contravened State law.  Id. at 705.  The Court of Appeals affirmed, noting in particular that a preliminary injunction was appropriate where, as in this case, it would sustain the status quo by keeping benefits flowing to plaintiffs, thus preserving the "court's ability to render a meaningful decision on the merits."  Id. at 733.

As in Ehrlich, in this case, a temporary restraining order and preliminary injunction are essential to maintaining the status quo and ensuring the continuation of critical benefits to Plaintiffs and hundreds of thousands of other eligible Marylanders.  The Court should issue a temporary restraining order and preliminary injunction in favor of Plaintiffs.

**A.      Plaintiffs are likely to prevail on their claims for declaratory judgment.**

**1.      Plaintiffs are likely to prevail on their claim that Defendants' early termination of CARES Act Benefits violates Title 8 of Maryland's Labor & Employment Article.**

Plaintiffs are likely to succeed on the merits of their complaint for a judgment declaring that Defendants' refusal to accept PUA, PEUC, and FPUC benefits on behalf of Maryland's citizens violates Title 8 of the Labor & Employment Article.   The plain language of Title 8, including the General Assembly's statement of legislative findings and policy conclusions regarding the dire effects of unemployment, makes clear that Defendants are required to accept these federally-funded unemployment benefits established by the CARES Act.

By its plain language, section 8-403(a) of the Labor & Employment Article requires that the Secretary accept federal UI funds.  In enumerating the sources of funding for the State's Unemployment Insurance Fund, Title 8 directs that the Fund "*shall* consist of: ... (6) money received from the Federal Unemployment Account in the Unemployment Trust Fund in accordance with Title XII of the Social Security Act; (7) money credited to the State

Unemployment Trust Fund Account under § 903 of the Social Security Act; and (8) money received for the Fund from any other source."  Lab. & Empl. § 8-403(a) (emphasis added).  The "Unemployment Trust Fund" referenced in § 8-403(a) is governed by 42 U.S.C. § 1104, which funds PUA and PEUC benefits.  This section also cross references 42 U.S.C. § 1105, which is the source of FPUC funding.[9]  Section 8-403(a), combined with the General Assembly's directive that Secretary Robinson must "cooperate with the United States Secretary of Labor *to the fullest extent that [Title 8] allows*," Lab. & Empl. § 8-310(a)(1) (emphasis added), establishes that Secretary Robinson has a statutory obligation to accept federal funds for the State's Unemployment Insurance Fund to maximize the flow of these benefits to Maryland's citizens.  Indeed, in order to effectuate the remedial purpose of the statute, Secretary Robinson's cooperation obligation *must* be read as requiring the receipt of *all* federal UI funds made available to Marylanders by the federal government under 42 U.S.C. §§ 1101, 1104, and 1105.  Rejecting available funds would constitute a lesser degree of cooperation than Title 8 allows.  By eschewing PUA, PEUC, and FPUC benefits, Defendants have contravened the General Assembly's clear directive regarding which moneys are required to make up the State's Unemployment Insurance Fund.

The Maryland General Assembly's clear legislative findings and public policy statements – which are a "guide to the interpretation and application of" Title 8 – further bolster the plain language requirements of Sections 8-310(a) and 8-403(a) that Secretary Robinson accept PUA, PEUC, and FPUC benefits on behalf of Plaintiffs and all other eligible Marylanders.  The

---

[9] The CARES Act Benefits are funded by federal unemployment programs established under 42 U.S.C. §§ 1101(a), 1104(a), and 1105(a).  Specifically, PUA benefits, including FPUC and administration costs, are funded by 42 U.S.C. §§ 1104(a) and 1105(a).  *See* 15 U.S.C. § 9021(g).  PEUC benefits, including FPUC, are funded by 42 U.S.C. §§ 1104(a) and 1105(a), while PEUC administration costs are funded by 42 U.S.C. § 1101(a).  *See* 15 U.S.C. § 9025(d).

General Assembly has concluded that there are grave economic, health, and welfare dangers posed by unemployment, describing it as a "serious menace to health, morals, and welfare of the people of [Maryland]."  Lab. & Empl. § 8-102(b).  The General Assembly's has also found that:

> [I]nvoluntary unemployment is a subject of general interest and concern that requires appropriate action by the General Assembly to prevent the spread of involuntary unemployment and to lighten its burden, which often falls with crushing force on the unemployed worker and the family of the unemployed worker;
>
> [T]he achievement of security for society requires protection against involuntary unemployment, which is the greatest hazard of our economic lives; and
>
> [S]ecurity for society can be provided ... by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment ....

Lab. & Empl. § 8-102(b).   The General Assembly further articulated its clear policy conclusion that "the public good and the general welfare of the citizens of the State require the enactment of [Title 8], under the police powers of the State, for the compulsory setting aside of unemployment reserves to be used for the benefit of individuals unemployed through no fault of their own."  Lab. & Empl. § 8-102(c).  To effectuate the remedial purpose of the statute and the public policy articulated by the General Assembly, Secretary Robinson is required to maximize the receipt of benefits available to eligible Marylanders.

Emergency legislation enacted on April 9, 2021 further evidences the General Assembly's clear intent to require that the Secretary of Labor accept fully-funded federal benefits: it requires the Maryland Department of Labor, on or before June 1, 2021, to "identify all changes in federal regulations and guidance *that would expand access to unemployment benefits* or reduce bureaucratic hurdles to prompt approval of unemployment benefits."  2021 Md. Laws Ch. 49, Section 3(a) (emphasis added).  The law further requires the Department of Labor, on or before July 1, 2021, to "revise State unemployment insurance rules and practices to

encompass any changes in federal regulations and guidance." 2021 Md. Laws Ch. 49, Section 3(b).

Finally, the Plaintiffs' likelihood of success is buttressed by the fact that a trial court in Indiana recently granted injunctive relief on the basis of similar state statutes and arguments raised by plaintiffs there. On June 14, 2021, a group of Indiana residents receiving CARES Act Benefits filed suit against the Governor of Indiana and the Commissioner of the Indiana Department of Workforce Development, alleging that the defendants violated Indiana law by prematurely terminating their access to CARES Act Benefits, and seeking injunctive relief to require the state to continue to administer the benefits. The court heard the plaintiffs' motion for preliminary injunction on June 23, four days after Indiana's termination of CARES Act Benefits took effect. On June 25, the court issued a decision, attached as Exhibit H, finding in plaintiffs' favor that Indiana law "requires the State to accept these benefits," and ordering the state to notify the U.S. Department of Labor "immediately" of its continued participation in the CARES Act programs. T.L. v. Holcomb, Marion Superior Court, Cause No.: 49D11-2106-PL-020140, Mem. Op. (June 25, 2021), Exhibit H at 10-11. In its order, the Indiana court cited provisions of Indiana law that, like Title 8, require the State to "coordinate with federal agencies with the same mission" of alleviating the economic insecurity caused by unemployment. Id., Exhibit H at 9 (citing Indiana Code § 22-4-1-1).

> **2.** **Plaintiffs are likely to prevail on their claim that Defendants' termination of UI benefits for 85% of Maryland UI recipients is without rational basis and violates Article 24 of the Maryland Declaration of Rights.**

In addition to being prohibited by state statute, Defendants' decision to cut off CARES Act benefits—which would eliminate all unemployment assistance for 85% of the Marylanders

who currently receive any type of UI benefits—denies equal protection under Maryland law to those individuals whose benefits would be terminated.

The Fourteenth Amendment of the United States Constitution provides, in pertinent part, that "[n]o State shall deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1.  Although Article 24 of the Maryland Declaration of Rights "does not contain an express equal protection clause, the concept of equal protection is embodied in the Article."  Frankel v. Board of Regents of Univ. of Md. System, 361 Md. 298, 313 (2000).  When evaluating an equal protection claim grounded on Article 24, Maryland courts utilize "in large measure the basic analysis provided by the United States Supreme Court in interpreting the like provision contained in the fourteenth amendment."  Att'y Gen. of Maryland v. Waldron, 289 Md. 683, 714 (1981).  That is, Maryland courts generally employ either strict scrutiny, a rational basis test, or some intermediate level of scrutiny to determine whether a government action violates equal protection under Article 24 and is thereby unconstitutional. See Waldron, 298 Md. at 705-14.

Where neither a suspect class nor a fundamental right is implicated, courts will generally use a rational basis test, under which the government action will be invalidated if the means chosen by the government actor are "wholly irrelevant to the achievement of the State's objective."  McGowan v. Maryland, 366 U.S. 420, 425 (1961); see also McDonald v. Board of Election Comm'rs, 394 U.S. 802, 809 (1969) (under rational basis test, action will be set aside if based on reasons "totally unrelated to the pursuit of" legitimate state goal).  While rational basis review is often "toothless" when employed by the Supreme Court, Maryland courts have employed a heightened rational basis test.  The Maryland Court of Appeals in Frankel explained that "this Court has not hesitated to strike down discriminatory economic regulation that lacked

any reasonable justification."  361 Md. at 315 (internal quotations omitted).  Additionally,

Maryland courts "have also required that a legislative classification rest upon 'some ground of

difference having a fair and substantial relation to the object of the legislation.'"  Verzi v.

Baltimore Cty., 333 Md. 411, 419 (1994) (quoting State Bd. of Barber Exam'rs v. Kuhn, 270

Md. 496, 507 (1973)).  Constitutionally invalid government action "often impose[s] economic

burdens, in a manner tending to favor [some Maryland] residents … over [other Maryland]

residents."  Frankel, 361 Md. at 315.

Defendants' actions here constitute just the sort of discriminatory action Maryland courts

have invalidated.  See id., 361 Md. at 318 (holding that state university's policy that precluded

in-state tuition status for any student whose primary monetary support came from an out-of-state

source discriminated against bona fide Maryland residents in violation of the equal protection

component of Maryland Declaration of Rights because the classification was arbitrary and not

rationally related to the purpose of the policy—i.e., to accord a reduced tuition benefit to bona

fide Maryland residents); Waldron, 289 Md. at 727 (holding that statutory section prohibiting a

retired judge who accepts a pension from engaging in practice of law for compensation created

classification that was not reasonably related to purpose—i.e., to "prevent the impropriety which

may result from an ex-judge appearing in judicial proceedings before his former colleagues"—

and therefore statute violated both federal and state equal protection guarantees); Kuhn, 270 Md.

at 509-12 (holding that statutory scheme prohibiting cosmetologists from rendering to male

patrons same services they could lawfully provide to female customers violated equal protection

because the classification it created—i.e., cosmetologists versus barbers—did not "rest upon

some ground of difference having a fair and substantial relationship to the object of the

legislation" and thus did not "have a rational relationship to a legitimate state purpose").

Defendants' actions purport to eliminate benefits for 85% of Marylanders who are eligible for UI benefits, while permitting benefits to continue to flow to the remaining 15% who currently receive it.  There is no rational justification for this distinction, rendering it unconstitutional.  In classifying some Marylanders as eligible to continue receiving aid and others as ineligible, the policy creates a classification that does not logically connect to the purpose of the policy (*i.e.*, to encourage people to go back to work).  It assumes without justification that those people who are eligible only for federal UI benefits are more likely to return to work quickly than those who are eligible for Maryland UI benefits.  There is no logical basis for this assumption.

Additionally, there is no other potential justification for making this classification, including saving money.  Cutting off 85% of currently UI-eligible Marylanders from any source of aid will not save the State any money, since the federal government is providing all of the funding for these benefits, as well as the related administration costs.  See *supra* n.3.  Moreover, Governor Hogan's stated rationale for this early termination, namely to address alleged worker shortages, is not grounded in fact.  Every study of this issue Plaintiffs have found has concluded that there is *no evidence* that the expansion of UI benefits has depressed job growth or slowed rehiring.  See *supra* Section IV.B.  See *also* Brian E. Frosh, Opinion: Maryland Gov. Hogan is wrong to cut extra unemployment benefits, Wash. Post (June 10, 2021), https://www.washingtonpost.com/opinions/2021/06/10/maryland-gov-hogan-is-wrong-cut-extra-unemployment-benefits/.

### B.     The balance of harms favors maintaining the status quo.

It is indisputable that Defendants will suffer zero harm should they be required to simply continue CARES Act Benefits for the remainder of the benefit terms.  In contrast, the harm to

Plaintiffs and the State from unlawful early termination of such benefits will be severe and lasting.  Terminating Maryland's participation in PUA, PEUC, and FPUC poses great risk to Plaintiffs and hundreds of thousands of other Marylanders who receive those benefits.  Many of these Marylanders, like Plaintiffs, have made plans for their economic future in reliance on the receipt of CARES Act Benefits through September 6, 2021.  By depriving Maryland workers of money that they were counting on to pay for housing, food, utilities and medical care, money that they planned to use to restart a business or get necessary training for a new career, money that they are entitled to receive under federal and state law, the State will undermine their livelihoods, their health, and their economic stability.

On the other hand, if the Court enjoins the State from prematurely terminating CARES Act Benefits, the State will not suffer in the least.  The funding for CARES Act Benefits has already been appropriated by Congress and is available in the Unemployment Trust Fund to be received by eligible Marylanders.  15 U.S.C. § 9021(g)(1)(B); 15 U.S.C. § 9023(d)(3); 15 U.S.C. § 9025(d)(1)(B).  The State's costs to administer CARES Act Benefits are also covered by CARES Act funding.  15 U.S.C. §§ 9021(d), 9023(d), 9025(a)(4)(A).  In other words, the benefits are available to eligible Marylanders at *no cost* to the State.  The State is not harmed in continuing to distribute CARES Act Benefits during the pendency of this litigation.  In any event, the total amount of time that could be affected is at most 69 days:  July 3 – September 10, 2021.[10]

---

[10] Although CARES Act Benefits are scheduled to expire on September 6, 2021, benefits notices have indicated that payments would terminate on September 10, 2021.

**C.      Plaintiffs will suffer immediate, substantial, and irreparable injury unless the Court orders preliminary injunctive relief.**

Unless the Court orders an injunction, Ms. D.A., Mr. D.M., Ms. Graham, Mr. A.M., and Mr. Baban could all lose their housing.  Exhibit A, Affidavit of D.A. at ¶¶ 6, 11; Exhibit B, Affidavit of D.M. at ¶ 12; Exhibit C, Affidavit of Jennifer Graham at ¶ 13; Exhibit D, Affidavit of A.M. at ¶ 9; Exhibit F, Affidavit of Shad Baban, at ¶ 10.  It is difficult to overstate the severity of the impacts that would flow from such housing loss.  Mr. Baban, for example, may find himself homeless with his wife and nine-month-old daughter, while Mr. D.M., who lives in a sober house, is at critical risk of relapse into addiction.  Plaintiff A.M. will also struggle to afford medical prescriptions for arthritis, diabetes, and high blood pressure, which could cause serious physical harm.  Exhibit D, Affidavit of A.M. at ¶¶ 9, 11.  Ms. D.A., Mr. D.M., and Ms. Graham will not be likely to be able to pay for groceries for themselves or their families.  Exhibit A, Affidavit of D.A. at ¶¶ 6, 11; Exhibit B, Affidavit of D.M. at ¶¶ 8, 13; Exhibit C, Affidavit of Jennifer Graham at ¶ 6.  It is unlikely that Mr. A.M. and Mr. Baxter will be able to afford basic expenses such as everyday bills and electricity.  Exhibit D, Affidavit of A.M. at ¶ 9; Exhibit E, Affidavit of Kevin Baxter at ¶ 10.  The State's irrational and unlawful decision to terminate benefits early has already caused serious emotional and mental harms, which will only be exacerbated if benefits are terminated early.  Exhibit C, Affidavit of Jennifer Graham at ¶ 14; Exhibit F, Affidavit of Shad Baban at ¶ 11.

As the Indiana trial court found in T.L. v. Holcomb, "a loss of housing or medical care and the inability to provide food, shelter and adequate childcare for a family constitute irreparable harm pending resolution of this cause of action and are not adequately compensable by an award of damages."  Exhibit H at 7.  Nor can mere delayed payment of the benefits now

due at the conclusion of this case possibly compensate for the dire consequences that could befall the Plaintiffs and other recipients in the meantime.

### D.     Granting preliminary injunctive relief serves the public interest.

Far from being "*not contrary* to the public interest," Md. Rule 15-504(a)(D) (emphasis added), the requested temporary restraining order and preliminary injunction indisputably *will serve* the public interest.  This injunction would simply maintain the status quo until September.  That is, it would keep essential federal UI benefits flowing to Plaintiffs and hundreds of thousands of other Marylanders who continue to rely on this financial support as a result of the unemployment crisis caused by the COVID-19 pandemic, and these benefits would come at *no cost* to the State.

Should Defendants be permitted to deviate from the status quo, nearly 85% of the 300,000 Marylanders currently receiving UI benefits will be left with no unemployment assistance at all.  Compl. ¶¶ 80-81.  Indeed, Defendants' unlawful decision to end prematurely the receipt of federal UI benefits will cost the State of Maryland approximately ***$1.9 billion*** in money that would otherwise flow directly to the most vulnerable Marylanders, including Plaintiffs.[11]  Rejecting these funds will further exacerbate existing inequities laid bare by the COVID-19 pandemic:  the latest data on Maryland UI recipients shows that nearly 59% of recipients are Black, Latinx, or other people of color.[12]  Moreover, that $1.9 billion would

---

[11] Andrew Stettner, Fact Sheet:  What's at Stake as States Cancel Federal Unemployment Benefits (May 13, 2021), https://tcf.org/content/commentary/fact-sheet-whats-stake-states-cancel-federal-unemployment-benefits/.

[12] U.S. Dep't of Labor, Employment & Training Administration, Characteristics of Unemployment Insurance Claimants (April 2021), https://oui.doleta.gov/unemploy/content/chariu2021/2021Apr.html#Maryland_Characteristics (last visited June 29, 2021).

continue to stimulate Maryland's economy and hasten its economic recovery.  This is among the intended benefits of UI and the CARES Act Benefits in particular.

Granting Plaintiffs' preliminary injunction would further serve the explicitly-stated public policy position that "the public good and general welfare of the citizens of the State require the enactment of [Title 8], under the police powers of the State, for the compulsory setting aside of unemployment reserves to be used for the benefit of individuals unemployed through no fault of their own."  Lab. & Empl. § 8-102(c).  See Ehrlich, 394 Md. at 733 (affirming grant of preliminary injunction and holding that the public interest prong was satisfied where continuing medical benefits aligned with legislative intent articulated in Welfare Innovation Act).

Finally, contrary to Governor Hogan's stated rationale for terminating CARES Act Benefits prematurely, studies have found no evidence that the expansion of unemployment benefits has driven job loss or slowed rehiring over the past year.  See supra Section IV.B.  There can therefore be no plausible argument that the public interest is served in any way by unnecessarily and unlawfully depriving eligible Marylanders of benefits to which they are entitled.

## II.    The Court Should Not Require Plaintiffs to Post a Bond.

While Maryland Rule 15-503 generally requires the party seeking an injunction to post a bond as security for the enjoined parties' potential damages, the Court may dispense with the requirement at the moving party's request.  Md. Rule 15-503(c).  In this case, Plaintiffs request that no bond be required.  Defendants are State officials, and Plaintiffs are beneficiaries of unemployment insurance benefits, seeking to vindicate their right to continued assistance.  As explained above, the State will not suffer damages if this Court issues an injunction.

## <u>CONCLUSION</u>

For all of the reasons stated herein, Owner respectfully requests that this Court enter an

Order:

(1) Requiring Governor Hogan to rescind his letter of June 1, 2021, providing notice of the State's termination of its participation in PUA, PEUC, and FPUC benefits;

(2) Enjoining Governor Hogan and Secretary Robinson, their officers, employees, and agents, all persons acting in concert or participation with any Defendant, or under any Defendant's supervision, direction, or control, from withdrawing the State of Maryland from unemployment benefits offered through the CARES Act;

(3) Ordering Governor Hogan and Secretary Robinson, on behalf of the State of Maryland, to immediately notify the U.S. Department of Labor of the State's continued participation in the CARES Act programs for the duration of those programs.

Respectfully submitted,

**GALLAGHER EVELIUS & JONES LLP**

/s/ Paul S. Caiola
Paul S. Caiola, CPF # 9512120109
Meghan K. Casey CPF # 1506090003
Hannah Logue Perng CPF # 1412170166
218 North Charles Street, Suite 400
Baltimore, Maryland  21201
Telephone: (410) 727-7702
Facsimile: (410) 468-2786
pcaiola@gejlaw.com
mcasey@gejlaw.com
hperng@gejlaw.com

**PUBLIC JUSTICE CENTER**

/s/ Sally Dworak-Fisher
Sally Dworak-Fisher, CPF # 0312220001
Debra L. Gardner, CPF # 8509010013
Monisha Cherayil, CPF # 0909020002
Tyra M. Robinson, CPF # 1912180113
201 North Charles Street, Suite 1200
Baltimore, Maryland  21201
Telephone: (410) 625-9409
Facsimile: (410) 625-9423

dworak-fishers@publicjustice.org
gardnerd@publicjustice.org
cherayilm@publicjustice.org
robinsont@publicjustice.org.


*Attorneys for Plaintiffs*

Dated: June 30, 2021

## Affidavit of D.A.

I solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of this document are true.

1. My name is D.A.

2. I live in Baltimore City, Maryland.

3. I am 29 years old.

4. Prior to the COVID-19 pandemic, I worked as a Chef at the Horseshoe Casino for two years and was let go when it closed in March 2020 because of the increasing risk of the COVID-19 pandemic.

5. I have received $389 in Pandemic Emergency Unemployment Compensation ("PEUC") and $300 in Federal Pandemic Unemployment Compensation ("FPUC") weekly.

6. I use my PEUC/FPUC to pay for portions of my rent, car insurance, car note, gas and electric bill, cable bill, and other monthly expenses for myself and my family.

7. In reliance on the expectation to receive benefits until September 2021, I continued to actively look for work online and was only able to secure temporary employment doing political canvassing in neighborhoods for forty hours per week from November 2020 to January 2021.

8. I have also researched what I think would be more stable career fields and found the Information Technology industry.  I enrolled in an Information Technology certificate program, will begin the course in July, and will complete the course by late September or early October.  I had expected to have the federal coronavirus unemployment benefits to help cover living expenses for my family as I learn a new skill or trade, with the hope that I will land a job in that field in the fall.

9. Because of Maryland's decision to end federal unemployment insurance benefits early, my unemployment insurance benefits will terminate July 3, 2021, instead of in September.

10. If my federal benefits are cut off, if I can find work at all, I may have to take on multiple jobs outside of my current expertise, and which will therefore not pay as much as my former position at the Horseshoe Casino.

11. If my federal benefits are cut off next week, I fear I will be homeless with my wife and stepdaughter, unable to afford groceries, and forced to live in an overcrowded situation with my parents until I can find a job to make ends meet.

_____         _____
D.A.                                             6/29/2021
                                                 Date

**EXHIBIT A**

## Affidavit of D.M.

I solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of this document are true.

1. My name is D.M.

2. I live in Baltimore City, Maryland.

3. I am 34 years old.

4. Prior to the COVID-19 pandemic, I worked in freelance television and film production.

5. On March 8, 2020, my last scheduled production shift was canceled when the media production industry canceled many projects.  At that time, I had no income.

6. I learned that unemployment insurance benefits had been extended to self-employed workers like me who are not usually eligible and applied for unemployment insurance.

7. Since March of 2020, I have been receiving $300 in Pandemic Unemployment Assistance ("PUA") and $243 in Federal Pandemic Unemployment Compensation ("FPUC") weekly.

8. I pay for housing, food, and other monthly living expenses for myself with my PUA.

9. I cannot return to my previous work this month because production work has not returned to pre-pandemic hiring yet and I have not been able to find work so far.  I knew that benefits were expiring in September of 2021, and so I planned to get an internship with a local employer in the media production industry for the summer and hoped to become an employee at the company following the internship.

10. Because of Maryland's decision to end federal unemployment insurance benefits early, my unemployment insurance benefits will terminate July 3, 2021, instead of in September.

**EXHIBIT B**

11. I am a person with an addiction and this condition will be exacerbated if I cannot maintain my current living arrangement.

12. If federal unemployment benefits are terminated early, I will not be able to pay my rent at the sober living house where I have lived since November 23, 2020, and will have to change my living arrangement, which is part of my treatment and recovery.  The only options I have for other housing will be unstructured and stressful environments for me and will increase my risk of relapse.

13. Additionally, I will not be able to buy groceries or pay my cell phone bill.  Not having a phone will make it much harder for me to find work.

_____           6/29/2021
                                            _____
D.M.                                        Date

### Affidavit of Jennifer Graham

I solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of this document are true.

1. My name is Jennifer Graham.

2. I reside in Montgomery County, Maryland.

3. Prior to the COVID-19 pandemic, I was a massage therapist.  Twelve years ago, I opened my own business.  I loved my work.

4. By the middle of March of 2020, I had to cancel all my clients and had no income.  I was scared because I had little to no savings in the bank.

5. I learned that unemployment insurance benefits had been extended to self-employed workers like me who are not usually eligible, so for the first time in my life, I applied for unemployment insurance.

6. While my benefits were approved by the end of March, they were delayed for several weeks, and I was not sure what was happening.  Because I was not confident of whether or when the benefits would actually come, I had to give up my office space and sold my massage tables to pay rent on my apartment and to pay for food.

7. Since May of 2020, I have been receiving $176 in Pandemic Unemployment Assistance ("PUA") and $300 in Federal Pandemic Unemployment Compensation ("FPUC") weekly.

8. I knew that benefits were expiring in September of 2021, and so I planned to try to reopen my business and re-start my career.  I reached out to colleagues for new space and found something that is available in September.  I made a budget and planned to purchase

EXHIBIT C

a used massage table and supplies (including personal protective equipment) as well, putting away some funds each month until September.

9.  Because of Maryland's decision to end federal unemployment insurance benefits early, my unemployment insurance benefits will terminate July 3, 2021, instead of in September.

10. If my benefits are cut off next week, I cannot return to my career or reopen the business I spent twelve years building.  I cannot afford to renew my massage therapy license, much less afford office space, a table, and supplies.

11. This is devastating to me both emotionally and financially.  I love what I do and want to reopen.  I spent more than a decade building my business, and I feel like it is being snatched from me.

12. If my benefits are cut off, I will have to spend down savings on necessities instead of getting back on my feet. I am going to look for other work, but I will need to work two jobs in fast food or retail to earn an income close to what I made in my chosen career.

13. I will likely lose my apartment, do not have any family to move in with, and have realized I may have to live in my car.

14. I have complex post-traumatic stress disorder and clinical depression, which I was able to manage with medication and therapy prior to the COVID-19 pandemic.  But both of these conditions have been exacerbated by worrying about my next meal and paying rent.

DocuSigned by:

*Jennifer Graham*

A45079A5C70F415...
_____
Jennifer Graham

6/29/2021
_____
Date

DocuSign Envelope ID: 479A333A-C2E0-43F8-AD9E-539CA9221391

### Affidavit of A.M.

I solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of this document are true.

1. My name is A.M.

2. I reside in Baltimore City, Maryland.

3. Prior to the COVID-19 pandemic, I was a Dining Room Attendant employed through Bon Appétit at Johns Hopkins University ("Johns Hopkins") for 40 years.

4. I was let go on May 11, 2021, when the dining room and most of Johns Hopkins closed.

5. I am 64 years old.

6. I am currently receiving $430 in regular unemployment insurance and $300 in Federal Pandemic Unemployment Compensation ("FPUC") weekly.

7. I knew that federal benefits were expiring in September of 2021, and I planned to be able to return to work by that time. Since I was let go in May, I looked for comparable work to my previous work but could not find the type of job I was qualified for because schools and restaurants were not re-hiring in full. Since Johns Hopkins is still not hosting as many of their summer programs, I do not have the opportunity to earn additional money. Bon Appétit recently reached out to me and let me know that Johns Hopkins would be able to bring many people back soon, possibly in late July. I will qualify as a person who can return to work then because of my seniority, and I am grateful for this because I love my work.

8. Because of Maryland's decision to end federal unemployment insurance benefits early, my federal unemployment insurance benefits will terminate July 3, 2021, instead of in September.

**EXHIBIT D**

9. If my federal benefits are cut off next week, I will not be able to pay my mortgage. My wife is retired. With her income and my unemployment benefits, we have been able to keep up with bills during this time. Without my FPUC benefit, we will not be able to meet our basic expenses. My wife and I may lose our home where we have lived for twenty years. and I will likely end up in debt.

10. If my benefits are cut off, I will have to spend down my savings on necessities instead of getting back on my feet. If that happens, my ability to support myself when I can no longer work will be jeopardized.

11. I have arthritis, diabetes, high blood pressure, and the stress of worrying about how to pay my bills will exacerbate these health conditions. Also, I will not be able to afford my prescriptions and could suffer serious consequences as a result.

DocuSigned by:

95875AB356424D2...

_____
A.M.

6/29/2021
_____
Date

## <u>Affidavit of Kevin Baxter</u>

I solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of this document are true.

1. My name is Kevin Baxter.

2. I reside in Baltimore City, Maryland.

3. Prior to the COVID-19 pandemic, I worked as a Cafeteria Attendant at the Hilton Baltimore Hotel ("Hilton") for thirteen years.

4. I was let go on March 16, 2020, when the Hilton closed.

5. I am 54 years old.  I planned to retire in eight years.

6. Since March 2020, I have received $321 in Pandemic Emergency Unemployment Compensation ("PEUC") and $300 in Federal Pandemic Unemployment Compensation ("FPUC") weekly.

7. I use my PEUC/FPUC to pay for rent in a residence I have lived in for five years, public transportation, and gas, electric, and cell phone bills.

8. In reliance on the expectation to receive benefits until September 2021, I continued to actively look for work online that would pay as much as my former employer paid with my years of experience.  However, I could not find anything remotely matching the same rate of pay I was earning and with a similar retirement plan.  I have also reached out to my employer to ask when work would be available, but they did not know when they would be able to call people back to work.

9. Because of Maryland's decision to end federal unemployment insurance benefits early, all my unemployment insurance benefits will terminate July 3, 2021, instead of in September.

**EXHIBIT E**

10. Without the supplemental PEUC/FPUC benefits, I will not be able to pay my gas, electric, or cell phone bills, and will not be able to pay for public transportation to get to job interviews or to a job if I am able to secure one.

11. I have been depressed and had anxiety over the early cut-off because my former industry is not bringing employees back in full yet and I am concerned about how I will pay for my monthly expenses and whether the loss of benefits will make it harder to find a job and leave me unemployed for even longer.

DocuSigned by:

_E4F18DFF939F42F..._

Kevin Baxter

6/29/2021

Date

DocuSign Envelope ID: DA701784-C036-4828-9472-A51703247EDD

**Affidavit of Shad Baban**

I solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of this document are true.

1. I reside in Dundalk, Baltimore County, with my wife and nine-month old daughter.

2. I worked for approximately seven years as a cook at the Hilton Baltimore Inner Harbor Hotel ("the Hilton") until March 2020, when I was laid off following the outbreak of the COVID-19 pandemic.

3. In late April 2020, I began receiving state Unemployment Insurance ("UI") benefits. In approximately November 2020, after I had exhausted my state UI benefits, I applied for and began receiving federal Pandemic Emergency Unemployment Compensation ("PEUC").

4. Since the winter of 2021, the total amount of my PEUC benefits has been $514 per week after taxes. I understand that this includes $300 per week in Federal Pandemic Unemployment Compensation ("FPUC").

5. My PEUC and FPUC benefits were temporarily suspended at the end of May 2021 because of a typographical error in the processing of my name, but the state Department of Labor has assured me that I remain eligible and that the error is being corrected such that I will resume receiving benefits imminently. My benefits account remains in "active" status.

6. I have been relying on the PEUC/FPUC income to pay for my family's basic monthly expenses, which include a mortgage for over $700 per month, groceries for approximately $300 per month, my daughter's specialized infant formula for over $180 per month, gas for over $160 per month, car insurance for over $100 per month, diapers

**EXHIBIT F**

for approximately $80 per month, and telephone service for over $70 per month. During the one-month temporary suspension of my PEUC/FPUC benefits, I have had to use a credit card to cover my family's expenses.

7. My family has no other source of income.

8. I have been actively looking for work since January 2021. I have applied for 10 to 15 jobs, including jobs outside my field, such as in grocery stores, but have not received any offers.

9. I have also contacted my former employer, the Hilton, about being re-hired. Management has advised me that they are gradually re-hiring former employees by department and on the basis of seniority but they do not yet have a position for me in the kitchen or elsewhere. Management has said they expect to continue to expand and will likely have work for me when the Hilton fully reopens.

10. If my PEUC/FPUC benefits are terminated on July 3, my wife and I will have no income for over two months, and possibly longer, and will be unable to pay for our family's expenses. I will have to give up my car, which I need in order to access locations where I could work. We will also almost certainly lose our home, and I am not sure whether or where we would find a safe place for the three of us to live. I do not have enough credit on my credit card to be able to pay for my mortgage, car, and other expenses over a period of several months.

11. Ever since learning that Maryland was terminating all PEUC/FPUC benefits, I have been so anxious that I have suffered appetite loss and severe insomnia. My doctor has prescribed me sleeping medication, which I rely on daily.

6/29/2021

_____
Date

DocuSigned by:

_____
A70969C68D9E41A
Signature



**STATE OF MARYLAND**
OFFICE OF THE GOVERNOR

**LARRY HOGAN**
GOVERNOR

June 1, 2021

The Honorable Martin J. Walsh
Secretary
U.S. Department of Labor
200 Constitution Avenue NW
Washington, D.C. 20210

Dear Secretary Walsh,

This letter serves as written notice that the State of Maryland will end its participation in the unemployment insurance programs listed below, effective at 11:59 pm on July 3, 2021.

Section XI of the "Agreement Implementing the Relief for Workers Affected by Coronavirus" (the "Agreement") signed by the Maryland Department of Labor on March 28, 2020, provides, in pertinent part:

> "This Agreement with respect to any of the provisions identified in paragraph XIV may be terminated by either party on thirty days' written notice."

This letter serves to provide the U.S. Department of Labor with the requisite thirty days' termination notice as required by Section XI and 15 U.S.C. §§ 9023(a), 9025(a)(1). Accordingly, Maryland will opt out of the following programs authorized by the Relief for Workers Affected by Coronavirus Act (P.L. 116-136), effective on the date set forth above:

- Federal Pandemic Unemployment Compensation (FPUC) (Addendum No. 2 of the Agreement)
- Mixed Earners Unemployment Compensation (MEUC) (Addendum No. 5 of the Agreement)
- Pandemic Emergency Unemployment Compensation (PEUC) (Addendum No. 4 of the Agreement)
- Pandemic Unemployment Assistance (PUA) (Addendum No. 1 of the Agreement)

At this time, Maryland has elected to remain in the following federal unemployment programs:

- Temporary Full Federal Funding of the First Week of Compensable Regular Unemployment For States With No Waiting Week (Addendum No. 3 of the Agreement)
- Emergency Unemployment Relief for Government Entities and Nonprofits (Section 2103)
- Federal Reimbursement of Short-Time Compensation (Section 2108)

**EXHIBIT G**

Thanks to Marylanders' resilience and tenacity, our state has seen a dramatic drop in COVID-19 cases, and we have reached the milestone set by President Biden of vaccinating 70% of adults. Businesses large and small across our state are reopening and hiring workers, but many are facing severe worker shortages. While we have experienced 12 straight months of job growth in our state, we will not truly recover until our workforce is fully participating in the economy.

Our administration, in partnership with your agency, will continue working with Marylanders who need reskilling and retraining to reach the next stages of their careers. The comprehensive resources available to our customers through a great variety of training and apprenticeship programs will continue to serve the needs of both Maryland's businesses and jobseekers.

I look forward to working with you and USDOL in the future to advance our common goal of helping workers find the path they need to succeed.

Sincerely,

Larry Hogan
Governor

STATE OF INDIANA ) IN THE MARION SUPERIOR COURT
                     ) SS:
COUNTY OF MARION ) CAUSE NO.: 49D11-2106-PL-020140

T.L., J.C., L.C, S.A.S., J.H.S., and )
CONCERNED CLERGY OF )
INDIANAPOLIS )
                               )
     Plaintiffs, )
                               )
     v. )
                               )
ERIC HOLCOMB, in his official capacity )
as GOVERNOR of the State of Indiana )
and FREDERICK PAYNE, in his official )
capacity as COMMISSIONER of the )
INDIANA DEPARTMENT OF )
WORKFORCE DEVELOPMENT )
                               )
     Defendants, )

**FILED**

JUN 2 5 2021

*Myla A. Eldridge*
CLERK OF THE MARION CIRCUIT COURT

### FINDINGS OF FACT,
### CONCLUSIONS OF LAW AND JUDGMENT

Comes now the Court, and, this matter having come before the Court on Plaintiffs'

Complaint for Declaratory Judgment and Injunctive Relief and Plaintiffs' Motion for Preliminary

Injunction, which were filed with the Court on June 14, 2021, and on Plaintiffs' Motion for

Emergency Hearing which was filed with the Court on June 17, 2021, and the parties, by

counsel, having come before the Court on the 23rd day of June, 2021, and having submitted this

matter to the Court for decision, now the Court, being duly advised in the premises, pursuant to

Trial Rule 52 (A) of the Indiana Rules of Trial Procedure, issues the following:

**EXHIBIT H**

FINDINGS OF FACT

(1)     The Court has jurisdiction over the parties herein and the subject matter of this action.

(2)     Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act in March 2020, codified as 15 U.S.C. § 9001 *et seq.* The CARES Act, in relevant part, provides for benefits, in the form of cash payments to qualified recipients, extensions of time to receive benefits, and extension of some payments to persons who would be otherwise be ineligible for unemployment benefits.

(3)     Through the CARES Act, Congress created three types of unemployment benefits for workers who would typically not be eligible for regular unemployment insurance ("UI") benefits (collectively "CARES Act Benefits"). These benefits offered expanded unemployment insurance coverage to the self-employed, workers without daycare or who needed to supervise children learning from home, and workers experiencing extended weeks of unemployment. 15 U.S.C. §§ 9021, 9025. Congress also recognized that increasing the amount of unemployment benefits for eligible workers would have a stabilizing effect on the economy. 15 U.S.C. § 9023.

(4)     One of these benefits, Pandemic Unemployment Assistance ("PUA"), is available for workers who were not eligible for regular unemployment benefits and whose unemployment, partial unemployment, unavailability or inability to work was caused by COVID-19. 15 U.S.C. § 9021.

(5)     A second category of benefit, Pandemic Emergency Unemployment Compensation ("PEUC"), added additional weeks of benefits for workers who had exhausted the number of weeks they could draw UI benefits. 15 U.S.C. § 9025.

2

(6)      . Federal Pandemic Unemployment Compensation ("FPUC")

increased the amount of UI benefits by $600-per-week from March 27, 2020, through July

31, 2020 and $300-per week from December 27, 2020 to September 6, 2021.  15 U.S.C. §

9023, further amended by the American Rescue Plan Act of 2021 ("ARPA").  Pub. L. No.

117-2, § 9011, 9013, 9016 (March 11, 2021).

(7)      PUA, PEUC and FPUC benefits are authorized through September 6,

2021.  ARPA § 9011, 9013, 9016.  Funds have been appropriated by Congress and are

available in the Unemployment Trust Fund to be received by eligible Hoosiers.  15 U.S.C. §

9021(g)(1)(B); 15 U.S.C. § 9023(d)(3); 15 U.S.C. § 9025(d)(1)(B).

(8)      The Plaintiffs in this cause of action, who are identified in the caption by their

initials, are all receiving benefits in varying amounts which are provided through the CARES

Act.  (The names of the Plaintiffs and their particular situations are more fully detailed in

their sworn statements contained in their individual affidavits which comprise the Appendix

of Exhibits in Support of Plaintiffs' Motion for Preliminary Injunction, which was filed with

the Court on June 14, 2021.)

(9)      Defendant Eric Holcomb is the Governor of Indiana.

(10)     Defendant Frederick Payne is the Commissioner of the Indiana Department of

Workforce Development

(11)     After enactment of the CARES Act, the Indiana Department of Workforce

Development entered into an agreement regarding PUA, PEUC, and FPUC with the U.S.

Department of Labor on behalf of the State of Indiana

(12)     On May 17, 2021, Governor Holcomb announced that Indiana would end its

participation in PUA, PEUC, and FPUC, effective June 19, 2021.  All parties acknowledge

3

that although this action was taken by the Governor, the Plaintiffs are continuing to receive CARES Act Benefits.

(13)     On June 14, 2021, the Plaintiffs filed their Complaint for Declaratory Judgment and Injunctive Relief and their Motion for Preliminary Injunction, pursuant to Trial Rule 65(A) of the Indiana Rules of Trial Procedure, with the Court.

(14)     In their Affidavits, the Plaintiffs state that the loss of benefits provided to them under the CARES Act will result in an inability to pay rent, utilities, necessary living expenses and medical care, face possible eviction and limit opportunities for necessary and affordable childcare.

(15)     On June 17, 2021, the Plaintiffs filed their Motion for Emergency Hearing. The Court set an emergency hearing for June 23, 2021.

(16)     On June 21, 2021, the Defendants filed a Motion to Continue the hearing set for June 23, 2021. The Defendants also filed a Motion for Change of Judge on June 21, 2021, pursuant to Trial Rules 76 (B) and 79 of the Indiana Rules of Trial Procedure and LR 49 – TR 79 – 223 of the Marion Circuit and Superior Court Civil Division Rules.

(17)     On June 23, 2021, the Court Denied Defendants' Motion to Continue Hearing.

(18)     The Court conducted the hearing in this matter on June 23, 2021 on an emergency basis.


## CONCLUSIONS OF LAW

(1)     Wherever appropriate or necessary herein, the above-stated "Findings of Fact" shall be construed and interpreted as Conclusions of Law.

4

(2)     Trial Rule 79 (O) of the Indiana Rules of Trial Procedure states: Nothing in this rule shall divest the original court and judge of jurisdiction to hear and determine emergency matters between the time a motion for change of judge is filed and the appointed special judge accepts jurisdiction.

(3)     The public policy of the State of Indiana is set out in I.C. 22-4-1-1 which states: As a guide to the interpretation and application of this article, the public policy of this state is declared to be as follows: Economic insecurity due to unemployment is declared hereby to be a serious menace to the health, morale, and welfare of the people of this state and to the maintenance of public order within this state. Protection against this great hazard of our economic life can be provided in some measure by the required and systematic accumulation of funds during periods of employment to provide benefits to the unemployed during periods of unemployment and by encouragement of desirable stable employment.  The enactment of this article to provide for payment of benefits to persons unemployed through no fault of their own, to encourage stabilization in employment, and to provide for integrated employment and training services in support of state economic development programs, and to provide maximum job training and employment opportunities for the unemployed, underemployed, the economically disadvantaged, dislocated workers, and others with substantial barriers to employment, is, therefore essential to public welfare; and the same is declared to be a proper exercise of the police powers of the state.  To further this public policy, the state, though its department of workforce development, will maintain close coordination among all federal, state, and local agencies whose mission affects the employment or employability of the unemployed and underemployed.

(4)     Indiana Code § 22-4-37-1 states, in relevant part, that "[i]t is declared to be the

5

purpose of this article to secure to the state of Indiana and to employers and employees in Indiana all the rights and benefits which are conferred under the provisions of 42 U.S.C. 501 through 504, 42 U.S.C. 1101 through 1109, 26 U.S.C. 3301 through 3311, and 29 U.S.C. 49 et seq., and the amendments to those statutes." The enumerated US Code sections deal with the establishment and funding of federal and state unemployment benefits schemes.

(5)     While an application for preliminary injunction is addressed to the trial court's discretion, the power to issue such an injunction should be used sparingly and should not be granted except in rare circumstances in which the law and facts are clearly in the moving party's favor. Steenhoven v. College Life Insurance Co. of America, Ind. App., 458 N E 2d 661, 667 (1984); Wells v. Auberry, Ind. App. 429 N E. 2d 679, 682 (1982). See also: Sadler v. State Ex. Rel. Sanders, Ind. App. 811 N E 2d 936, 952-53 (2004); Robert's Hair Designers, Inc., v. Pearson, Ind. App. 780 N E 2d 858, 863 (2002).

(6)     A trial court's discretion to grant or deny preliminary injunctive relief is measured by several factors: (1) whether the plaintiff's remedies at law are inadequate, thus causing irreparable harm pending the resolution of the substantive action if the injunction does not issue; (2) whether the plaintiff has demonstrated at least a reasonable likelihood of success at trial by establishing a prima facie case; (3) whether the threatened injury to the plaintiff outweighs the threatened harm the grant of the injunction may inflict on the defendant; and (4) whether, by the grant of the preliminary injunction, the public interest would be disserved. In order to grant a preliminary injunction, the moving party has the burden of showing, by a preponderance of the evidence, that the facts and circumstances entitle him to injunctive relief. Apple Glen Crossing v Trademark Retail, 784 NE 2d 484, 487-88 (Ind. 2003); Barlow v. Sipes, Ind. App., 744 NE 2d 1,5 (2001); Reilly v. Daly, Ind. App., 666 NE 2d 439, 443 (1996).

(7)    The function of a preliminary injunction is to preserve the status quo pending the final determination of the case on the merits. Mercho-Roushdi Corp v. Blatchford, Ind. App. 742 NE 2d 519, 524 (2001); City of Fort Wayne v. State ex rel. Hoagland, Ind. App. 342 NE 2d 865, 869 (1976).

(8)    Preliminary injunctions are generally used to preserve the status quo as it existed before a controversy, pending a full determination on the merits of the dispute. Stoffel v. Daniels, Ind. App., 908 NE 2d 1260, 1272 (2009); U.S. Land Servs v. U.S. Surveyor, Ind. App. 826 N.E. 2d 49, 67 (2005) (emphasis supplied)

(9)    Despite Indiana's attempt to end PUA, PEUC and FPUC benefits, continuing to allow access to these benefits favors the status quo as they have been available in their current form since December 27, 2020, or roughly six months.

(10)   A loss of housing or medical care and the inability to provide food, shelter and adequate childcare for a family constitute irreparable harm pending resolution of this cause of action and are not adequately compensable by an award of damages.

(11)   To establish a party has a reasonable likelihood of success on the merits, the party must establish a prima facie case. Hannum Wagle & Cline Engineering, Inc. v. Am. Consulting, Inc., 64 N.E.3d 863, 874, Ind.App. (2016) (citing Apple Glen Crossing, LLC v. Trademark Retail, Inc., 784 N.E.2d 484, 487 (Ind. 2003)). "The party is not required to show that he is entitled to relief as a matter of law, nor is he required to prove and plead a case, which would entitle him to relief upon the merits." Hannum Wagle, 64 N.E.3d at 874 (quoting Avemco Ins. Co. v. State ex rel. McCarty, 812 N.E.2d 108, 118, Ind. App. (2004).

(12)   There is a likelihood of success on the merits. The burden on this element can be

7

shown by establishing a *prima facia* case. Ind. High Sch. Athletic Ass'n, Inc. v. Martin, 731

N.E.2d 1, 7 (Ind.App. 2000), *rehearing denied, transfer denied.* Substantial probative evidence

means "more than a scintilla and less than preponderance." *Id.* (quoting Partlow v. Indiana

Family and Soc. Servs. Admin*.*, 717 N.E.2d 1212, 1217, Ind.App. (1999)). Plaintiffs who seek

preliminary injunctive relief are not required to show that they are entitled to relief as a matter of

law, nor required to prove and plead a case would entitle them to relief upon the merits. *Ind.*

*High Sch. Athletic Ass'n, Inc.*, 731 N.E.2d at 7 (quoting Norland v. Faust, 675 N.E.2d 1142,

1149, Ind.App., (1997)). .

(13)     Unemployment benefits under the CARES Act are funded by and

through the federal unemployment programs established under 42 U.S.C. §§ 1101(a), 1104(a),

and 1105(a). See 15 U.S.C. § 9021(g), 15 U.S.C § 9025 (d) and 15 U.S.C. § 9023(d). These are

the same statutes enumerated in Ind. Code 22-4-37-1.

(14)     Indiana Code § 22-4-37-1 charges the State of Indiana with the responsibility of

securing "all the rights and benefits" conferred under certain federal statutes, including 42 U.S.C.

§§ 1101, 1104 and 1105. Presently, Congress has authorized an enhanced use of benefits

conferred under 42 U.S.C. § 1101, *et seq.* for pandemic relief through September 6, 2021. By

rejecting these benefits after June 19, 2021, Defendants are in violation of their statutory duties,

entitling Plaintiffs to declaratory and injunctive relief.

(15)     The Legislature's determination in I.C. 22-4-37-1 is an instruction to the

Department of Workforce Development to administer unemployment benefits available in the

Unemployment Trust Fund. Similar to the Legislature's determination of other aspects of the

system of unemployment benefits in Indiana, like the number of weeks a claimant may be

8

eligible or how to calculate a claimant's monetary benefit amount, I.C. 22-4-37-1's directive to secure all rights and benefits conferred by 42 U.S.C. § 1104 is binding on the State.

(16)    A preponderance of the evidence demonstrates the State of Indiana's decision to prematurely end PUA, PEUC and FPUC benefits in Indiana violates I.C. 22-4-37-1. Therefore, Plaintiffs have shown reasonable likelihood of prevailing on the merits of their declaratory judgment action.

(17)    The third factor in the preliminary injunction analysis is whether the threatened injury to the Plaintiffs outweighs the potential harm to the State resulting from the granting of an injunction.

(18)    The State's costs to administer the CARES Act Benefits are also covered by CARES Act funding.  15 U.S.C. §§ 9021(g), 9023(d), 9025(a)(4)(A). Therefore, the State is not harmed in continued distribution of CARES Act benefits during the pendency of this litigation.

(19)    The balance of harms in granting the injunction favors the Plaintiffs. The harm created by the loss of benefits by the plaintiffs far outweighs any potential harm to the State.

(20)    As previously cited, "Economic insecurity due to unemployment is declared hereby to be a serious menace to the health, morale and welfare of the people of this state and to the maintenance of public order within this state."  Ind. Code § 22-4-1-1. In describing the consequences of poverty Plaintiffs will face without the CARES Act unemployment benefits, the Plaintiffs have contextualized the problems of economic insecurity described in I.C 22-4-1-1.

(21)    Indiana law requires that to further this public policy, the State is required to coordinate with federal agencies with the same mission. Ind. Code § 22-4-1-1.

(22)    The injunction is in the public interest because it is the articulated public policy

9

interest in Ind. Code § 22-4-1-1 and the benefits at issue are instrumental in allowing Hoosiers to regain financial stability at an individual level while the State continues to face challenges presented by the COVID-19 pandemic during its return to normalcy.

(23)     Indiana law recognizes the importance of these benefits. Indiana law requires the State to accept these benefits.

(24)     Plaintiffs' proposed injunction would not disserve the public interest. Rather, the public interest is served by granting injunctive relief which secures Federal benefits for unemployed Hoosiers at no cost to the State.

(25)     The plaintiffs in this cause of action seek relief which is both basic and modest: to maintain receipt of their current benefits pending a more complete consideration of their claims which are before the Court. That is the status quo that they seek to preserve. Contrary to the assertion of the Defendants, this request would not create a disruption in the operation of state government. The total amount of time that could be affected here is only at most eighty (80) days: June 19 – September 6, 2021.

(26)     The law is with the Plaintiffs and against the Defendants in the issues presented for determination. Accordingly, based on the applicable law, the Plaintiffs have carried the burden in seeking a preliminary injunction.

## **JUDGMENT**

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** that Defendants,

Governor Eric Holcomb and Commissioner Frederick Payne, their officers, employees, and agents; all persons acting in active concert or participation with any Defendant, or under any Defendant's supervision, direction, or control; and all other persons within the scope of Indiana

Trial Rule 65, are enjoined from withdrawing the State of Indiana from unemployment benefits offered through the Coronavirus Aid, Relief, and Economic Security ("CARES") Act until this Court renders a final judgment on the merits.  Indiana shall notify the U.S. Department of Labor immediately of its continued participation in the CARES Act programs pending further action by this Court.

ALL OF WHICH IS ORDERED, ADJUDJED AND DECREED THIS  *25*  DAY OF JUNE, 2021.

JUDGE MARION SUPERIOR COURT
CIVIL DIVISION, ROOM NUMBER ELEVEN

cc:
All counsel of record

11

## IN THE CIRCUIT COURT FOR BALTIMORE CITY

| | |
|---|---|
| **D.A., et al.,** | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | *   **Case No. _____** |
| | * |
| **LARRY HOGAN, in his official capacity as** | * |
| **GOVERNOR of the State of Maryland, et al.,** | * |
| | * |
| Defendants. | * |
| | * |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## [PROPOSED] ORDER ON MOTION FOR TEMPORARY
## RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Upon review of Plaintiffs' Motion for Temporary Restraining Order and Preliminary

Injunction ("Motion"), the Memorandum and affidavits filed by Plaintiffs in support thereof,

any opposition to the Motion, any oral argument, and pursuant to Maryland Rules 15-501(c),

15-502, 15-503, and 15-504, on this ____day of _____, 2021, at _____ A.M./P.M., it

is hereby **ORDERED**, as follows:

1.      The Court **FINDS**, pursuant to Maryland Rule 15-504(a) and based on

Plaintiffs' affidavits or sworn testimony on the record ("Testimony"), that it clearly appears

that immediate, substantial, and irreparable harm will result to Plaintiffs before a full adversary

hearing can be held on the propriety of a preliminary or final injunction;

2.      The Court **FINDS**, pursuant to Maryland Rule 15-504(c) and based on

Plaintiffs' Complaint and Testimony, that if the Court does not issue the relief granted herein,

Plaintiffs would suffer irreparable harm because a loss of housing or medical care, the inability

to provide food and shelter for a family, and attendant mental health impacts constitute

irreparable harm and are not adequately compensable by an award of damages;

3.      The Court **FINDS** that Plaintiffs have proven they are likely to succeed on the merits of their claims; (b) the balance of harms favors Plaintiffs; (c) Plaintiffs will suffer immediate, substantial, and irreparable injury unless a temporary restraining order is granted; and (d) the public interest will be served by granting Plaintiffs a temporary restraining order;

4.      The Court **FINDS**, pursuant to Maryland Rule 15-504(b), that Plaintiffs have provided Defendants adequate notice that Plaintiffs are seeking the relief granted herein;

5.      Governor Hogan shall rescind his letter of June 1, 2021, providing notice of the State's termination of its participation in certain CARES Act unemployment benefits as further described in the Motion and supporting Memorandum;

6.      Governor Hogan and Secretary Robinson, their officers, employees, and agents, all persons acting in concert or participation with any Defendant, or under any Defendant's supervision, direction, or control, shall be enjoined from withdrawing the State of Maryland from unemployment benefits offered through the CARES Act;

7.      Governor Hogan and Secretary Robinson, on behalf of the State of Maryland, shall immediately notify the U.S. Department of Labor of the State's continued participation in the CARES Act programs for the duration of those programs;

8.      Pursuant to Maryland Rule 15-503(c), the Court dispenses with the requirement of a bond;

9.      Pursuant to Maryland Rule 15-504(f), a party or person affected by this Order may move for modification or dissolution of the Order on two days' notice to Plaintiffs, or on such shorter notice as the Court may prescribe.

10.     The Clerk shall serve this Order on all counsel of record; provided, however, that pursuant to Maryland Rule 15-504(d), this Order shall be **BINDING** on Defendants by receipt of actual notice by any means; and

11.     This Order shall **EXPIRE** on _____ _____, 2021 at _____ A.M./P.M.


_____
Judge
Circuit Court for Baltimore City